**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
UNITED STATES OF AMERICA      :
                              :
        v.                    :
                              : Crim. No. 3:94-cr-00223 (AWT)
                              :
RALPH MORENO                  :
```

**ORDER DENYING MOTION FOR SENTENCE REDUCTION**
**UNDER THE FIRST STEP ACT**

Defendant Ralph Moreno has moved for a sentence reduction under Section 404 of the First Step Act, based on application of the Fair Sentencing Act of 2010, and Section 603 of the First Step Act, commonly referred to as "compassionate release." For the reasons set forth below, his motion for reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and Sections 404 and 603 of the First Step Act (ECF Nos. 2623, 2656) is hereby DENIED.[1]

---

[1] The defendant originally filed a motion for resentencing under § 404 of the First Step Act arguing that "Mr. Moreno is entitled to resentencing on all of his counts of conviction, as convictions for other, non-covered offenses do not bar relief." Def.'s Mot. (ECF No. 2623) at 2. After the government filed a supplemental memorandum in opposition to the defendant's motion arguing that his motion for sentence reduction was moot, citing United States v. Martin, 974 F.3d 124 (2d Cir. 2020), the defendant filed a motion to stay. He subsequently filed his motion for resentencing under Section 603 of the First Step Act but did not withdraw his motion for resentencing under Section 404. Therefore, that motion is being denied based on Martin.

# I

On February 8, 1996, a grand jury returned a Third Superseding Indictment against Ralph Moreno and twelve co-defendants, charging Moreno with VCAR offenses (the "VCAR Indictment"). See Third Superseding Indictment (ECF No. 1047). On July 26, 1996, following a lengthy trial, Moreno was convicted on four counts:

> Count 3: Violent Crime in Aid of Racketeering (VCAR) – Conspiracy to Murder Latin Kings, in violation of 18 U.S.C. § 1959(a)(5);
>
> Count 4: VCAR Murder of Marcelina Delgado, in violation of 18 U.S.C. § 1959(a)(1);
>
> Count 5: VCAR Attempted Murder of Angel Delgado, in violation of 18 U.S.C. §§ 2, 1959(a)(5); and
>
> Count 6: VCAR Assault of Angel Delgado, in violation of 18 U.S.C. §§ 2, 1959(a)(3).

With respect to Counts 3 and 5, Moreno faced up to ten years of imprisonment. On Count 6, he faced a maximum term of twenty years of imprisonment. On Count 4, he faced a maximum term of life imprisonment.

Moreno was sentenced on November 18, 1996. "Moreno fell in Criminal History Category V, which included his involvement in two additional murders." Gov't's Opp'n (ECF No. 2673) at 11. See id. at 21 ("Moreno killed Marcelina Delgado while on probation for his involvement in a murder, another drive-by shooting where an innocent victim was killed. . . . Then, less

than three months after killing Marcelina Delgado and wounding

her father, a tragedy that brought notoriety to the community,

Moreno shot and killed another man, Marsiano Rivera.") (emphasis

omitted).

> The PSR noted that "under the provisions of Section 5K2.0,
> the court may consider the social conditions in existence
> within the community at the time of the instant offenses
> and the lack of mediating social structures as mitigating
> factors," PSR-2 ¶ 96, a suggestion to which the government
> vigorously objected at sentencing. Doc. # 1643 at 20-21.

Def.'s Mem. (SEALED ECF No. 2659) at 36.

> During the sentencing proceeding,
>
> Defense counsel argued that the killing of Marcelina
> Delgado was a horrible event . . . not only for Marcelina
> Delgado and her family, but the entire community of
> Hartford.  The Court rejected argument by defense counsel
> that the killing was not premeditated, or that even 60 or 70
> years would be an appropriate sentence.  The Court
> considered Moreno's background and characteristics,
> including the two other murders with which he was involved
> and, ironically, that his tight-knit family moved to
> Hartford to escape violence.  Moreno himself indicated that
> he expected a life sentence.

Gov't's Opp'n at 12 (citations and internal quotation marks

omitted).

Moreno was sentenced to life imprisonment on Count 4 (VCAR

murder of Marcelina Delgado), a twenty-year term of imprisonment

on Count 6 (VCAR assault of Angel Delgado), a ten-year term of

imprisonment on Count 3 (VCAR conspiracy to murder Latin Kings),

and a ten-year term of imprisonment on Count 5 (VCAR attempted

murder of Angel Delgado).  The sentences were imposed to run

concurrently.  Terms of supervised release of three years were
imposed on each count, to run concurrently.

Moreno had previously been indicted, with twenty-seven co-
defendants, for crimes related to narcotics distribution (the
"Narcotics Indictment").  See Superseding Indictment, ECF No.
126 at 8.  Moreno had pled guilty to the charges in the
Narcotics Indictment and had been sentenced on February 5, 1996,
to 126 months of imprisonment on Count 20 of the Narcotics
Indictment; a mandatory minimum term of eight years of
supervised release was also imposed.  The sentence imposed on
November 18, 1996 was imposed to run concurrently with the
sentence for the Narcotics Indictment.  Thus, the only sentence
that Moreno was serving when the instant motions were filed was
the life sentence for the murder of Marcelina Delgado.

The Government's Opposition contains the following summary
of the offense conduct in connection with the sentence he is
currently serving, based on the presentence report:

> Moreno's convictions arose from a joint federal, state
> and local task force investigation, responsible for
> investigating rampant gang-related violence and narcotics
> activity in Hartford, Connecticut and elsewhere.
> Narcotic[s] PSR at ¶ 7, Dkt. No. 2624-3. The primary focus
> of the investigation was the Los Solidos gang, a visible
> presence in Hartford believed to be responsible for a wave
> of violence. Id. The gang was financed in large part by
> street-level narcotics trafficking operations and violent
> crime, which was also used to intimidate competitors and
> maintain territorial claims. Id.

Los Solidos was organized and operated under a written charter, consisting of a President, Vice-President, Secretary, Head Warlords, Warlords, Superiors, Stars, Enforcers and Soldiers. Id. There were up to 250 members of the gang in the Hartford area alone. Id. . . . . The gang maintained a cache of firearms for the "Family," and higher-ranking members were authorized to order lower-ranking members to conduct violent missions for the gang, which included drive-by shootings and assassinations of rival gang members. Id.

Los Solidos members, including Moreno, distributed and sold narcotics at Solidos-controlled drug "gates." Id. . . . .

Moreno held the rank of soldier in Los Solidos. VCAR PSR at ¶ 20, Dkt. No. 2624-11. On March 26, 1994, Moreno attempted to shoot and kill rival Latin King gang members. VCAR PSR at ¶ 9, Dkt. No. 2624-11. Instead, he shot and killed 7-year old Marcelina Delgado and shot and wounded her father Angel in front of their family. Id.

The murder occurred on the date of a scheduled Los Solidos "family" meeting in Hartford, during a time of increased hostilities and tensions with the rival Latin Kings gang. Id. Anthony Gunn, a Los Solidos soldier assigned to the Solidos drug gate on Charter Oak Terrace in Hartford, lived with his mother and siblings on the Latin Kings controlled side of the housing complex, intended to go to the meeting. Id. However, Latin Kings members were in front of his house waiting for him and had fired shots at the house. Id. Unable to leave, Gunn, acting in accordance with the rules of Los Solidos, called an enforcer, Michael Armstrong, for assistance. Id.

At the meeting, Miguel Hernandez, who was to be inducted as a Los Solidos member, was speaking with President Jorge Rivera and approached by Armstrong, who asked to borrow Hernandez's car. Id. Hernandez agreed and lent Armstrong his red Pontiac Firebird. Id. Once the meeting began, Head Warlord Luis Geraldo Leon privately engaged Rivera in conversation, and then signaled to Moreno and Pablo Rosado to exit the meeting. Id. Outside, Moreno and Rosado entered a gray Cadillac, with Moreno driving. Moreno told Rosado that they were going to the "D-side" where some brothers were in trouble. Id.

Moreno and Rosado drove to the Charter Oak Terrace Housing Complex. Id. Upon arriving, Moreno and Rosado exited their Cadillac and spoke with Armstrong, who had the red Firebird. Id. Armstrong informed Moreno and Rosado that Los Solidos members were trapped, and instructed Rosado to retrieve a gun. Id. Rosado returned with a nine-millimeter Tec-9 semi-automatic pistol. Id. Moreno and Rosado then drove to the "A-side" of the housing complex, with Moreno driving the Cadillac. Id. In a parking lot, several Latin Kings members were standing next to a gray Toyota. Rosado leaned out of the vehicle and tried to shoot them, but the pistol jammed. Id.

Moreno and Rosado returned to the "D-side," where Moreno disposed of the malfunctioning pistol. Id. Moreno left and returned with a second Tec-9 pistol. Id. Moreno and Rosado switched cars with Armstrong, as Latin Kings had observed the Cadillac and it was believed that the red Firebird was faster. Id. Rosado drove back to the "A-side," with Moreno in the passenger seat. Id. On Overlook Terrace, Moreno and Rosado saw a gray Toyota, similar to the car near which Latin Kings members had been standing. Id. Moreno stood up in the Firebird and fired six or seven shots into the Toyota, which swerved off the road. Id.

Inside the car were no Latin Kings. Id. Instead, Angel Delgado, an innocent garage mechanic, who was driving his wife and three daughters to his mother's house to deliver groceries. Id. Delgado was shot in the back but later recovered from his wound. Id. His 7-year-old daughter, Marcelina, was shot in the head as she slept in the back seat of the car. Id. She did not survive. Id. Moreno disposed of the firearm while Rosado disposed of the car. Id. The Tec-9 pistol Moreno used to kill Marcelina Delgado was moved to a Springfield, Massachusetts Los Solidos chapter. Id. It was later recovered during a routine traffic stop. Id.

Gov't's Opp'n at 3-6.

There were four named defendants in Counts 3 through 6 of the VCAR Indictment, Ralph Moreno, Angel Torres, Michael Armstrong, and Jorge Rivera.

Michael Armstrong accepted a plea agreement before trial, pleading guilty to Count 4, VCAR murder of Marcelina Delgado, and was sentenced to a term of imprisonment of 270 months with 5 years supervised release. See Change of Plea, Dkt. No. 1195; Sentencing, Dkt. No. 1680. See also Govt Resp. to Pet. Mot., Dkt. No. 2318.

Angel Torres accepted a plea agreement before trial, pleading guilty to Count 3, VCAR Conspiracy to murder Latin Kings, and was sentenced to a term of imprisonment of 120 months with 3 years supervised release. See Change of Plea, Dkt. No. 1193; Sentencing, Dkt. No. 1380, Judgement, Dkt. No. 1394.

Jorge Rivera, President of Los Solidos, proceeded to trial with Moreno. See Verdict Form, Dkt. No. 1443. Rivera was convicted on Counts 3-6, among other counts. Id. Rivera received, in total, 13 life sentences. See Judgment, Dkt. No. 2325-1. See also Order Re: Motion to Vacate Sentence, Dkt. No. 2333. On Counts 3-6, Rivera received the same sentence as Moreno. Id. On Count 3, VCAR conspiracy to murder Latin Kings, Rivera received a 120 month sentence. Judgment, Dkt. No. 2325-1. Id. On Count 4, VCAR murder of Marcelina Delgado, Rivera received a sentence of life imprisonment. Id. On Count 5 VCAR attempted murder of Angel Delgado, Rivera received a sentence of 120 months imprisonment. Id. On Count 6 VCAR assault of Angel Delgado, Rivera received a sentence of 240 months imprisonment. Id.

Gov't's Opp'n at 10, n.4.

## II

Under Section 404 of the First Step Act, "[a] court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed."

First Step Act of 2018, Pub. L. No. 115-391, § 404(b), 132 Stat. at 5222.

Also, the First Step Act amended, inter alia, Section 3582(c)(1)(A) of Title 18 of the United States Code.  That provision requires as an initial matter that

> the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . .

18 U.S.C. § 3582(c)(1)(A).  Assuming a defendant has exhausted administrative remedies, a court may reduce a term of imprisonment under Section 3582(c)(1)(A)(i) if, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, the court finds that "extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission".  18 U.S.C. § 3582(c)(1)(A)(i).  In making this determination courts should "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.  Neither Application Note 1(D), nor anything else in the now-outdated version of Guidelines § 1B1.13, limits the district court's discretion."  United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020).

Moreno has satisfied the requirement with respect to exhaustion of administrative remedies.

### III

The defendant moves for reduction of his sentence

in light of (a) his extraordinary rehabilitation during over a quarter century of incarceration, (b) his history of severe childhood trauma (c) his young age, 22, at the time of his offense (d) the unusual length of his Guidelines-mandated sentence (e) the harsh conditions of confinement due to the COVID-19 pandemic and the continuing danger posed by the Delta variant; and (f) the § 3553(a) factors as applied in his case.

Def.'s Emergency Mot. (ECF No. 2656) at 1. Some of the defendant's arguments lack merit, and to the extent others have some merit to them, that merit is outweighed by the need for the sentence he is currently serving to reflect the seriousness of the offense.

The defendant argues that the fact that he was 22 years old at the time he killed Marcelina Delgado weighs in favor of a sentence reduction. "[H]e relies particularly on evidence regarding his childhood and upbringing in Hartford." Gov't's Opp'n at 29-30. As the government notes, "At the age of 15, he also was involved in the drive-by shooting death of man. VCAR PSR at ¶46, Dkt. No. 2624-11." Gov't's Opp'n at 30. As the government also notes,

Judge Dorsey was well aware of many of the circumstances of Moreno's childhood when he imposed sentencing, many of these circumstances Moreno now re-advances. See, e.g., VCAR PSR at ¶¶ 67, 72, Dkt. No. 2624-11 (reporting Moreno's

9

childhood substance abuse, the death of his childhood
friend). But strikingly, and now evidenced through the
litany of letters accompanying his motion, Moreno grew up
in close-knit family who had moved to Hartford to escape
violence, with a father who advised him to stay away from
the streets and the gangs – advice Moreno ignored. VCAR PSR
at ¶¶ 56-59, Dkt. Nos. 2624-11, 2624-4.

Gov't's Opp'n at 30.

The defendant argues that his "unusually lengthy sentence
is an extraordinary and compelling factor supporting a sentence
reduction." Def.'s Mem. (ECF No. 2657) at 42. As the
government notes:

> Moreno attempts to equate his offense to that of an
> "average" homicide sentence. . . ., [b]ut VCAR murder of a
> 7-year-old girl, a broad day public execution intended to
> kill rival gang members, committed in front of her family
> and injuring the young girl's father, is not average. . . .
> Involvement in the murder of Marsiano Rivera *after* the
> high-profile killing of Marcelina Delgado is not average.

Gov't's Opp'n at 27-28 (emphasis in original). As the
government also notes, "were Moreno were convicted today, he
would face mandatory life imprisonment (or, potentially, the
death penalty). See 18 U.S.C. § 1959(a)(1)." Gov't's Opp'n at
28.

With respect to conditions of confinement related to the
pandemic, as the government notes, Moreno has been vaccinated.
See Gov't's Opp'n at 35.

The defendant argues that his rehabilitation while he has
been incarcerated and his history of childhood trauma constitute

extraordinary and compelling circumstances supporting a

reduction of his sentence.  The defendant's memorandum explains:

> At FCI Otisville, Mr. Moreno has critically and
> thoughtfully examined the harms he has caused the Delgado
> and Rivera families through the Victim Impact program. He
> has shared his reflections while mentoring others and
> facilitating the Victim Impact program, lifers program
> Getting Out by Going In (GOGI) program. Mr. Moreno also
> engages in less formalized mentorship through his
> involvement with the Muslim community and other
> relationships in prison. BOP staffers have consistently
> noted Mr. Moreno's willingness to be a respectful, rule-
> following community member who is very engaged in
> programming. Numerous people have attested to how Mr.
> Moreno has guided them to stay on productive, peaceful life
> paths.

Def.'s Mem. (ECF No. 2657) at 23.  The defendant has submitted a

lengthy personal statement in support of his motion.  The court

is favorably impressed by his personal statement, including how

he discusses his personal growth as a result of his

participation in the classes related to the Victim Impact

Program.  The letter reflects much in the way of self-

examination and reflection.  For example, he writes: "I wish

that I could have been able to apologize to them back in 1996

during the trial but your Honor I was so ignorant & stupid that

I couldn't even think of the things I've done to give a proper

apology & honestly I probably wouldn't have meant it back then."

Def.'s Mem. (ECF No. 2657), Exh. A.  "My life is a long and ugly

road full of things that I am ashamed of saying, and especially

of putting on paper." <u>Id.</u>  "I was saved by my incarceration".
<u>Id.</u>  "This selfishness was a coping mechanism." <u>Id.</u>

In his personal statement Moreno also references his
history of severe childhood trauma and explains why he was
unable to discuss it for so long, e.g., "it took me 25 years".
<u>Id.</u>

The government contends that "[Moreno's] rehabilitation is
not remarkable."  Gov't's Opp'n at page 39.  Furthermore, it
maintains that to the extent the defendant can demonstrate that
extraordinary rehabilitation and a history of severe childhood
trauma constitute extraordinary and compelling reasons to reduce
his sentence, those reasons do not warrant a sentence reduction
because they are outweighed by the Section 3553(a) factors.  The
court agrees.  Thus, the court does not resolve the questions of
whether his rehabilitation while he has been incarcerated and a
history of severe childhood trauma constitute extraordinary and
compelling reasons.

The government contends that "Moreno's violent history,
including involvement in three murders, weighs against a reduced
sentence" (Gov't's Opp'n at 20) and that "society deserves
lifetime protection from him" (id. at 3).  The government also
contends that "[t]he availability of a life sentence reflects
the gravity that our society places on Moreno's conduct – murder
of a 7-year-old girl – and should not be reduced. Now, . . . ,

Moreno would face a mandatory-minimum life sentence for his conduct. Moreno, and other members of society, must remain deterred from VCAR murder where a life sentence is (now) mandatory where death results, and the statutory penalties for VCAR murder continue to protect society from such vile plots." Gov't's Opp'n at page 27.

The materials submitted by Moreno, including his personal statement, create a genuine issue as to whether protecting society is still a purpose of sentencing that needs to be given significant weight.  However, regardless of how that issue is resolved, the court believes that the most significant Section 3553(a) factor here is the purposes of sentencing and the purpose of sentencing that should be given the greatest weight in this case is the need for the sentence imposed to reflect the seriousness of the offense with respect to the sentence Moreno is currently serving.  In the court's view, the goal of having the sentence imposed reflect the seriousness of that particular offense would be undermined to a material degree by reducing the sentence to a sentence of less than life imprisonment.

It is so ordered.

Signed this 27th day of February 2025 at Hartford, Connecticut.

/s/AWT
_____
Alvin W. Thompson
United States District Judge

13